Marcel ALLEYNE and Earl LeGrande, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

TIME MOVING & STORAGE INC. and the Time Record Storage Company, LLC, Defendants.

No. 08CV1356ENVSMG.

United States District Court, E.D. New York.

Jan. 28, 2010.

Abdul Karim Hassan, Law Office of Abdool Hassad, Esq., Queens Village, NY, for Plaintiffs.

## MEMORANDUM AND ORDER

VITALIANO, District Judge.

In April 2008, plaintiffs Marcel Alleyne and Earl Legrande commenced this action on behalf of themselves and a putative class of others similarly situated, alleging defendants failed to pay overtime compensation to employees in violation of the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–19, and New York Labor Law § 160 ("NYLL"), which seeks recovery of the unpaid overtime wages, liquidated damages and attorney's fees.[1] On June 23, 2009, the parties entered into a class settlement agreement and promptly sought preliminary class certification and settlement approval under Federal Rule of Civil Procedure 23, which the Court granted. Plaintiffs then moved for final class certification and settlement approval. Objections were filed to class certification and to the settlement. A fairness hearing was held on September 23, 2009. This Memorandum and Order constitutes the

---

1. Legrande died shortly after the action was filed. Alleyne continues to pursue the claims as the sole representative plaintiff.

Court's findings of fact and conclusions of law.

### BACKGROUND

Defendants Time Moving & Storage, Inc., a New York corporation, and The Time Record Storage Company, LLC, a New York limited liability corporation (collectively, "Time Moving"), are engaged in the business of providing storage and moving services to a variety of clients—ranging from financial institutions to law firms, primarily but not exclusively in the New York City metropolitan area. Defendants are jointly controlled from the same offices in Brooklyn, and operate several warehouses in New York and New Jersey in connection with their business.

In servicing clients, each of defendants' employees performs, for the most part, a variety of roles. All client jobs are routed through a dispatcher, who staffs them. Warehouse supervisors and warehousemen move clients' property on and off moving trucks and in and out of storage in the warehouses. Drivers, obviously, drive moving trucks containing cargo to and from the warehouses. Helpers, or "movers", travel with the trucks and help to transport cargo. Carpenters, or "installers", carry tools and assemble and disassemble office furniture and equipment to be moved and stored. Employee responsibilities, however, are not only not sharply defined, but by plan and practice, they are "blurred." (Transcript of Fairness Hearing ("Tr.") at 15, 29).

As a result, defendants have asserted that employees in these five types of job classifications, who constitute the putative class, all played some part in the packing, loading and moving of defendants' trucks, and, therefore, none were ever entitled to overtime premium pay because they fell into the FLSA's motor carrier exemption, 29 U.S.C. § 213(b)(1). In general terms, the motor carrier exemption relieves employers of the overtime obligations of the FLSA and NYLL when the employer is a "motor carrier" and the employee regularly or periodically is called upon to perform duties that affect the safe operation of the employer's vehicles in interstate commerce. Common examples are employees who drive an employer's motor vehicles or are responsible for loading and unloading cargo transported by the vehicles. It is undisputed that Time Moving is a "motor carrier." The motor carrier exemption is the 800–pound gorilla in the courtroom.

On June 23, 2009, the parties entered into a class settlement agreement, which precipitated the motion for preliminary class certification and approval of the settlement agreement. That motion was granted on July 1, 2009. The class certification and settlement of class claims necessarily pertain solely to the state law claims of the putative class, as FLSA claims are ineligible for certification under Rule 23 and can only be certified as "collective actions" pursuant to 29 U.S.C. § 216(b). See 5 James Wm. Moore et al., Moore's Federal Practice § 23.04[1] (3d ed.2009). Although the amended complaint indicated an intent to seek recovery both under the FLSA via a collective opt-in action and under state law via a Rule 23 class action (in which class members are bound unless they opt out), an affidavit from proposed class counsel states that if the Court approves class certification and settlement under Rule 23, plaintiff will not pursue an FLSA collective action. (See Declaration in Support of Class Certification and Preliminary Settlement Approval, Dkt. No. 8 at ¶ 16).

In its July 1, 2009 Order, the Court provisionally certified the following class for settlement purposes: "All individuals employed by Defendants between January 1, 2002 and the Effective Date (as defined in the Settlement Agreement) (the 'Relevant Period') as an hourly employee in the following functions: (1) Drivers, (2) Movers, (3) Installers, (4) Warehousemen, and (5) Warehouse Supervisors, and who are listed on Exhibit A to the Settlement Agreement." This definition covers approximately 417 individuals, of whom 74 are current employees of defendants and 343 are former employees. (See Declaration of Arthur J. Robb in Support of Motion for Class Certification and Final Approval of Class Settlement, Dkt. No. 23 at ¶ 3).

Named plaintiff Alleyne is undisputedly covered by the class definition. He was em-

ployed on an hourly basis by defendants for approximately two years, from 2005 to 2007. Based on his regular and recurring duties as an employee of defendants, Alleyne has been classified as an installer for purposes of the settlement agreement.

Proposed class counsel, Abdul K. Hassan, avers that, after excluding opt-outs and individuals who could not be located for notice purposes, there are approximately 341 class members who will be bound by the settlement and judgment in this case if approved by the Court. (See Supplemental Statement of Compliance with Class Action Procedure, Dkt. No. 24 at ¶ 5). Defendants initially provided Mr. Hassan with addresses for only 355 of the 417 known class members. Three of those 355 individuals are plaintiffs in a separate FLSA case previously filed and pending against defendants in this Court, captioned McIntosh v. Time Moving & Storage Inc., No. 07–cv–2226–ENV–SMG. Mr. Hassan also represents the plaintiffs in McIntosh, and was aware that they would be opting out of the class in this action. Accordingly, Mr. Hassan mailed 352 notices of this action via first-class mail on July 24, 2009. The notices provided an individualized estimate of the amount that each putative class member would be entitled to receive under the settlement agreement, and informed them that they had 30 days after the July 24, 2009 mailing date to opt out of the class or file objections to the settlement.

Of the 352 notices sent in the July 24, 2009 mailing, 122 were returned as undeliverable due to incorrect or outdated addresses. However, one of these 122 mis-addressees, Darren Gold, timely filed an objection, together with two other class members whose notices had not been returned, Edwin Perez and Johnny Spruill (together with Darren Gold, the "objectors"). In late September 2009, defendants twice provided Mr. Hassan with supplemental lists of contact information for class members who had not yet been located, and supplemental notice mailings were made on September 18 and 23, 2009.

All told, after all three mailings were completed, a net number of 58 notices were returned as undeliverable, and seven putative class members chose to opt out: the three parties to McIntosh, three individuals who are parties to other actions against defendants pending elsewhere, and one other person. The wives of two deceased class members, Earl Legrande and Neil Magliano, received their husbands' notices and asked proposed class counsel for their shares of the settlement (if any). No party opposes the requests of the two widows.

By the terms of settlement, defendants agree to provide a common settlement fund of $180,000, of which each class member is allotted a share based on his overtime hours, rate of pay, and job classification. Any unclaimed settlement funds are to revert to defendants. The settlement fund is divided into "job funds", calculated by taking the aggregate maximum overtime premiums for the covered job classifications and applying agreed-upon multipliers that purportedly reflect the relative strengths of the claims of— and concomitantly, assess the likelihood that the motor carrier exemption would be found applicable to—each type of employee in the class. (See Tr. at 45–50; Settlement Agreement, Dkt. No. 9 at ¶ 3.2). The multipliers are: Driver—10%; Mover—15%; Installer— 40%; Warehouseman—40%, and Warehouse Supervisor—50%. The net class of 341 individuals consists of: 236 movers (69.2%), 73 drivers (21.4%), 11 installers (3.2%), 16 warehousemen (4.7%), and 5 warehouse supervisors (1.5%).[2]

Each class member was classified based on his regular, recurring duties. If a worker performed a job task on an episodic or isolated basis, he would not be deemed part of that classification. In the event that a class member regularly performed multiple separate job functions, he was assigned to the category with the lower multiplier under the settlement agreement. (See Tr. at 33). As an installer, representative plaintiff Alleyne is assigned one of the higher, though not the highest, multipliers.

2. The set of 58 undeliverables is also composed primarily of movers—it consists of 52 movers and 6 drivers. (See Dkt. No. 24 at ¶ 5).

Attorney's fees payable to class counsel are capped in the agreement at one-third of the settlement fund, or $60,000, payable out of the fund. The settlement agreement also provides that both of the originally named plaintiffs, Alleyne and Legrande, will receive $1000 incentive payments (Legrande's being payable to his widow).[3] The agreement is conditioned on provisions that class members who do not opt out agree to waive their claims against defendants, and that defendants, notwithstanding settlement funding, deny liability or wrongdoing arising out of the asserted claims.

On August 21, 2009, the three objectors collectively filed their opposition to class certification and the settlement agreement. In short, objectors argue that the proposed class, class representative and class counsel are inappropriate, the settlement is inadequate and the proposed class attorney's fees are excessive. Additionally, objectors raise issues regarding the timing of the settlement of this action and changes in the status of other actions pertaining to defendants' pay practices. Objectors are named plaintiffs in a FLSA case against defendants and others filed in 2008 and currently pending before Judge Colleen McMahon in the Southern District of New York, *Perez v. Time Moving & Storage, Inc.*, 08–cv–2775.[4] The putative class in that action is a subset of the proposed plaintiff class here—the so-called "helpers", who are defined as employees who neither worked in the warehouse nor drove moving trucks. Shortly after Judge McMahon directed that a class certification motion be filed in *Perez*, a settlement agreement was announced in this case, and defendants moved to transfer *Perez* to this Court. Judge McMahon denied the transfer motion.

Objectors express suspicion regarding the timing of the settlement agreement and motion for preliminary certification in this case, which occurred almost contemporane-

ously with Judge McMahon's directive to the parties in *Perez* to establish a briefing schedule on class certification. Objectors assert that this is redolent of collusion between defendants and proposed class counsel in this action, and that the negotiation of the settlement agreement may have suffered as a result of the defendants' desire to "choose their own plaintiffs" and the representative plaintiff's desire to beat the *Perez* plaintiffs in a "race to the courthouse." The fairness hearing ensued.

### *DISCUSSION*

#### A. Class Certification

■ The Second Circuit has established, and recently reiterated, the following guidelines regarding class certification under Rule 23:(1) a district judge may certify a class only after making determinations that all of Rule 23's requirements have been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement, finds that the underlying facts relevant to each have been established and is persuaded to rule, based on the facts and applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical to a Rule 23 requirement; and (4) the judge should not assess any aspect of the merits unrelated to a Rule 23 requirement. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 34–35 (2d Cir.2009). In the context of considering a motion for class certification, the Court accepts all of the allegations in the complaint as true, *see In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 487 n. 5 (S.D.N.Y.2002), and a proponent of class certification must meet the Rule 23 requirements by a preponder-

---

**3.** The amount of this incentive payment is well within the range of permissibility. *See Gulino v. Symbol Tech., Inc.*, No. 06–cv–2810, 2007 WL 3036890, at *1 (E.D.N.Y. Oct.17, 2007) (noting that incentive payments are "normally in the range of $1,000 to $5,000").

**4.** When the *Perez* case was commenced, there were five named plaintiffs: the three objectors,

plus Nelson Escobar and Javier Yangua. Given their employment history with defendants, all five named plaintiffs in *Perez* qualify as members of the class in this action. The three objectors chose to withdraw from *Perez* to join this action, while the other two opted out of this class and continued with their claims in *Perez*.

ance of the evidence. *See Flag Telecom*, 574 F.3d at 35.

In accordance with the foregoing principles, plaintiff must first demonstrate that the putative class fulfills the four prerequisites set forth in Rule 23(a): numerosity, commonality, typicality, and adequacy. The numerosity requirement is met where the difficulty or inconvenience of joining all members of the class makes use of the class action appropriate. *See Cent. States Se. and Sw. Areas Health and Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 504 F.3d 229, 244–45 (2d Cir.2007). The commonality requirement is met where the class members' grievances share a common question of law or of fact. *See Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir.1997). The typicality requirement is met where the claims of the class representative are typical of those of the class, each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability. *See Robinson v. Metro–N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir.2001). Finally, the adequacy requirement is met with a showing that the class representative will fairly and adequately protect the interests of the class. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 267 (2d Cir.2006).

If the Court finds that the Rule 23(a) criteria are satisfied, it moves on to the next analytical step. As certification here is sought pursuant to Rule 23(b)(3), the Court then conducts a two-pronged inquiry: first, whether the class's common questions of law or fact predominate over questions affecting only individual members; and, second, whether a class action is superior to other available methods for fairly and efficiently adjudicating this controversy. Finally, plaintiff must demonstrate that proposed class counsel can adequately represent the interests of the class under Rule 23(g).

The Court is mindful, of course, that many of the elements of Rule 23 tend to overlap or merge with each other, and that the Second Circuit advises district courts to "adopt a standard of flexibility." *Marisol A.*, 126 F.3d at 376. Ultimately, courts have broad discretion in determining whether to certify a class and are encouraged to construe the requirements of Rule 23 liberally in order to effectuate its overall purposes, which include the protection of small claims through aggregation and the preservation of judicial resources. *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52 (2d Cir.2000); *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 563 (2d Cir.1968). In addition, it is appropriate for a court to take into account the inability of the poor or uninformed to enforce their rights and the improbability that large numbers of class members would possess the initiative to litigate individually. *See D'Alauro v. GC Serv. Ltd.*, 168 F.R.D. 451, 458 (E.D.N.Y.1996).

1. *Rule 23(a)*

i) *Numerosity*

Rule 23(a)(1) provides that a class may be certified only if "the class is so numerous that joinder of all members is impracticable." The rule does not mandate that joinder of all parties be impossible. The Second Circuit has held that numerosity is presumed at as few as 40 class members. *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995). Here, the number of claimants vastly exceeds that threshold. Plaintiff's counsel asserts that there are approximately 341 class members who would be part of the plaintiff class and potentially affected by the settlement. (*See* Dkt. No. 24 at ¶ 5). Plainly, to the extent that there are common issues affecting the 341 class members, individual adjudications of their claims would be expensive, time-consuming, and burdensome on the Court. A group of this size would make the joinder of individual members as named plaintiffs impracticable. Numerosity is therefore satisfied.

ii) *Commonality and Typicality*

Subsection (a)(2) requires that there be "questions of law or fact common to the class", and (a)(3) requires that the "claims or defenses of the representative parties are typical" of the class. As a practical matter, the two requirements merge in the Second Circuit's inquiry. *See Caridad v. Metro–*

*North Commuter R.R.,* 191 F.3d 283, 291 (2d Cir.1999). The commonality and typicality requirements are satisfied "when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove defendant's liability." *Robidoux v. Celani,* 987 F.2d 931, 936–37 (2d Cir.1993).

■ The claims of the Time Moving class members, including named plaintiff Alleyne, all arise out of the same alleged conduct— namely, Time Moving's failure to pay time-and-a-half wages to employees who worked more than 40 hours in a week. As noted at the top, moreover, defendants have asserted, as a common defense to the claims of all class members, that the motor carrier exemption applies across the board regardless of nominal job title. Time Moving takes the position that, in any event, it did not maintain distinct divisions between employees performing the various tasks involved in the moving and storage process—in short, they claim that everybody multi-tasked as a matter of regular operation.

■ The FLSA requires that employees engaged in interstate commerce be paid "at a rate not less than one and one-half times the regular rate at which he is employed" for work in excess of 40 hours per week; New York's labor law is to the same effect. 29 § U.S.C. 207; *see* N.Y.L.L. § 160(3). However, Congress has enacted a broad range of exemptions from this rule, including the motor carrier exemption, codified at 29 U.S.C. § 213(b)(1). In order for the motor carrier exemption to apply, the employer must be within the jurisdiction of the Secretary of Transportation by virtue of operating as a "motor carrier" or "motor private carrier", and the employee's activities must affect vehicular safety of operations in interstate or foreign commerce. *Dauphin v. Chestnut Ridge Transp., Inc.,* 544 F.Supp.2d 266, 273 (S.D.N.Y.2008). Obviously, Time Moving is engaged in the business of "providing motor vehicle transportation for compensation", which is the precise definition of a covered "motor carrier." 49 U.S.C. § 13102(14). But, since in derogation of a worker's benevolent act, the motor carrier exemption is narrowly construed against any employer who seeks to invoke it, its application is limited to what falls plainly and unmistakably within its terms and spirit, with the employer bearing the burden of proving that the exemption applies. *Dauphin,* 544 F.Supp.2d at 272

In sum, if each class member were to litigate his claims individually, each one would have to show Time Moving failed to pay him overtime and each one would have to grapple with the same defense—that the motor carrier exemption applied to him and that he was therefore excluded from the overtime provisions of the FLSA and NYLL. Therefore, construing Rule 23's requirements liberally, and assuming for the sake of this inquiry that plaintiff's allegations are true, the Court finds that the commonality and typicality necessary for class certification have been demonstrated here.

Objectors, as one might likely imagine, disagree. They press that a determination of the motor carrier exemption requires a fact-specific inquiry into each employee's individual duties. Objectors also postulate that employees in one of the job classifications included in the putative class, "drivers", are obviously and unquestionably covered by the motor carrier exemption, while employees in the other job classifications—movers, installers, warehousemen and warehouse supervisors—at least have colorable arguments that they are not covered.

Regardless, the fact remains that all putative class members were allegedly harmed by a common practice—Time Moving's indiscriminate "no overtime, period" policy—and that their grievances relate to this universal practice implicate common questions of law and fact. Furthermore, class certification is not automatically defeated by throwing a subset of the class under the truck; differences among class members as to the number of hours worked, the precise work they did and the amount of pay they received concern the amount of damages to which any individual class member might be entitled, not the amenability of their claims to Rule 23 certification. *See Torres v. Gristede's Operating Corp.,* No. 04–cv–3316, 2006 WL 2819730, at *14 (S.D.N.Y. Sept. 29, 2006); *Noble v. 93 Univ. Place Corp.,* 224 F.R.D.

330, 343 (S.D.N.Y.2004); *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 86 (S.D.N.Y.2001).

In addition, objectors contend that it is improper for the class to contain both former and current employees of defendants, reasoning that former employees only care about receiving the highest immediate pay-out, while current employees have an added interest in preventing future overtime violations by defendants and retaining the ability to collect for any such future violations—rights that objectors assert would be waived in the settlement agreement. However, the overwhelming bulk of the class consists of former employees, like representative plaintiff Alleyne, for whom any negotiated prospective relief would have no benefit. Further, current employees do not require the protection of negotiated prospective relief because they have the protection of the law—the settlement agreement does not purport to release claims arising after the effective date, meaning that all class members may seek redress in court or before the appropriate administrative agencies for any future violations.

■ Alternatively, based on their critique, objectors urge the Court, pursuant to subsection (c)(5), to create formal subclasses aligned with the various worker classifications covered by the settlement agreement. Upon due reflection, the Court nonetheless rejects objectors' argument that the creation of subclasses is warranted in this case. Granted, the creation of subclasses may sometimes be called for where there is an unequal allocation of a settlement fund to different categories of class members. More pointedly, subclasses are necessary when it is clear that, unlike here, proposed class members have diametrically opposed interests. Objectors cling to the inclusion of the "driver" classification as evidence of conflicted interest in the overall class. The argument ignores what a thorough review of the record as a whole establishes: work tasks assigned to and performed by Time Moving employees were "blurred" as a matter of ordinary operations, as opposed to a haphazard happening or occurring in any *de minimis* fashion, i.e., the motor carrier exemption is a common

enemy to all class members and not just to the "drivers".

In any event, the Second Circuit has indicated that subclasses are less likely to be deemed necessary where class certification is sought pursuant to Rule 23(b)(3), because those aggrieved by the differentiation have the choice of opting out. *See In re Joint E. and S. Dist. Asbestos Litig.*, 982 F.2d 721, 745 (2d Cir.1992) (modified on reh'g *sub nom*) ("Of course, our insistence on subclasses to reflect the adverse interests of the subgroups affected by the Settlement is premised on the Trial Courts' use of Rule 23(b)(1)(B) on a mandatory non-opt-out basis. If, on remand, the existing Settlement, or some revision of it, can be achieved under Rule 23(b)(3) with objectors permitted to opt out, we would not require [the class] to be subdivided into subclasses.").

Implicit in this flexibility is that there is a downside to creating subclasses—and it is significant. To create subclasses is to increase the expense to the overall class and the time demands on both the Court and the parties, as the Court would have to appoint counsel for each subclass, and analyze and certify each subclass according to the same Rule 23 standards. Furthermore, if subclasses are created in this case, the settlement agreement, by its terms, will be voided and litigation will resume. Given the practical realities of this case, that is, the similarity of the claims and (especially) defenses raised, the small number of objections (the three objectors, who constitute less than 1% of the 341–member putative class, are the only members who have submitted objections), the fact that potential class members were given an opportunity to opt out and the small number of individuals who chose to take that opportunity (seven, all but one of whom were already pursuing similar actions), the Court finds that the creation of subclasses is neither necessary nor advisable. Nor do any of objectors' arguments undermine the Court's finding that the commonality and typicality requirements have been met.

### iii) *Adequacy*

■ Subsection (a)(4) requires a finding that the proposed action will fairly and ade-

quately protect the interests of the class. To satisfy this requirement, the named representative plaintiff must show that there is an absence of conflict and antagonistic interests between himself and the class members, and that plaintiff's counsel is qualified and competent to conduct the litigation. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625–26, 117 S.Ct. 2231, 2250–51, 138 L.Ed.2d 689 (1997); *Iglesias–Mendoza v. La Belle Farm, Inc.,* 239 F.R.D. 363, 373 (S.D.N.Y. 2007).

 There were, as previously noted, two representative plaintiffs who initiated this class action, Alleyne and Legrande. As Legrande is now deceased, Alleyne continues on as the lone representative plaintiff. Objectors argue that Alleyne is an inadequate class representative because he no longer works for Time Moving, on the baldly-asserted logic that the interests of current employees are divergent from those of former employees. Yet, the great majority of the class members are former employees like Alleyne, and more importantly, the settlement agreement only resolves claims prior to its effective date, meaning it does not circumscribe the rights of current employees to assert additional claims against defendants that may have arisen or will arise after that effective date. Accordingly, there is no conflict in interest between former and present employees of defendants that would render Alleyne an inadequate class representative under these circumstances. *See Guzman v. VLM, Inc.,* No. 07–cv–1726, 2008 WL 597186, at *7 (E.D.N.Y. Mar.2, 2008) (finding "no conflict" where named plaintiff was no longer employed by defendant, though other class members were); *Ansoumana,* 201 F.R.D. at 86 (S.D.N.Y.2001) ("Because this is a suit primarily for money damages stemming from past actions, it is not relevant that only one of the named Plaintiffs is still employed [by the defendant].").

Objectors also point out that the settlement agreement only allows recovery back to January 1, 2002, although the First Amended Complaint suggests that recovery for claims arising as early as June 4, 2001 might be possible by relation back to the *McIntosh* case. According to objectors, because Al-

leyne has no reason to care about the date range of the settlement agreement so long as it predates the start of his employment with defendant in 2005, Alleyne neglected to protect the interests of workers whose tenure with defendants began earlier. Despite this concern, objectors do not indicate that their own recoveries are affected by this slight time difference. Indeed, by their own admission, objectors are not impacted by the short gap, since their declarations indicate that each started working for Time Moving in 2003 or later. (*See* Declaration of David Stein, Dkt. No. 15–1, Ex. C). No other employee or ex-employee of defendants has, in fact, raised an objection to class certification or settlement on this ground (or any other ground). Further, plaintiff points out that Federal Rule of Civil Procedure 15 permits relation back only in the context of amended pleadings filed in a single action, and that the First Amended Complaint in this action therefore could not possibly have related back to the filing date of the complaint in a wholly separate action.

 On another tack, objectors argue their belief that they are not being adequately represented by putative class counsel, Mr. Hassan, and request to be granted leave to intervene by and through their own counsel, David Stein of the law firm of Samuel & Stein, who also represents objectors in their capacities as named plaintiffs in the *Perez* action in the Southern District. Objectors express the view that Mr. Hassan's allocation of the monies in the settlement fund, and his assignment of payment multipliers to the various job categories in the class (purportedly representing the relative strength of their claims) was essentially arbitrary. Claiming to be members of the settlement agreement's "mover" classification, objectors contend that their work did not affect motor vehicle operation safety at all. Therefore, they assert that Mr. Hassan cannot adequately represent both their claims and the comparatively weak claims of class members in the "driver" classification. Notwithstanding objectors' contention, in the context of the applicability of the motor carrier exemption to "movers" as well as "drivers", the Court sees no basis to perceive such inherent

conflict in pursuit of claims both so seriously challenged by precisely the same exception to the wage and hour laws.

First, as set forth in detail in the affidavit submitted by Mr. Hassan to the Court in support of final certification and settlement (the "Hassan affidavit"), during the last seven years counsel has exclusively litigated 150–plus wage and hour cases, including class actions, and including the *McIntosh* action against the same defendants named in this case. (*See* Dkt. No. 18 at ¶¶ 38–44). Indeed, Mr. Hassan has developed a subspecialty in litigation of cases that turn on the federal motor carrier exemption and has handled a number of such cases in recent years, including an extremely complex matter previously before this Court, *Khan v. IBI Armored Services, Inc.*, 474 F.Supp.2d 448 (E.D.N.Y.2007). More critically, during the pendency of *McIntosh*, Mr. Hassan conducted extensive investigation into and took formal discovery of Time Moving and its pay practices, and analyzed legal arguments regarding the applicability of the motor carrier exemption to Time Moving employees who performed various types of job functions. His background and experience certainly militate in favor of finding that he is a more than adequate class counsel.

Second, the Hassan affidavit offers proof that contradicts the heart of objectors' perceived conflict. It explains in detail the logic underlying selection of the multipliers for the various job titles in the plaintiff class and how the representative plaintiff and settlement structure adequately served the interests of *all* of the class members. Recapitulating the settlement analysis, the Hassan affidavit explains that "supervisors" were assigned the highest multiplier (50%) because they were the least likely to have performed exemption-covered physical labor such as truck-loading. On the other hand, "drivers" and "drivers' helpers" (i.e., "movers") are specifically listed in the motor carrier exemption regulation as job titles covered by the exemption, and therefore these claims are arguably the weakest and were assigned the lowest multipliers. "Installers" and "warehousemen" likely participated in or assisted with truck loading at some point, the affidavit

relates, but their primary job duties were largely physically performed away from the moving trucks and, accordingly, their multipliers were in the middle of the range. Moreover, the settlement methodology related by Mr. Hassan was confirmed in open court at the fairness hearing by his negotiating partner, Arthur J. Robb, counsel for Time Moving. (*See* Tr. at 45–50).

It is on this base that the Court must make its assessment. As a general rule, the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information. In particular, the opinion of experienced and informed counsel is entitled to considerable weight. *See In re Elan Sec. Litig.*, 385 F.Supp.2d 363, 371 (S.D.N.Y.2005); *In re Am. Bank Note Holographics, Inc.*, 127 F.Supp.2d 418, 429–30 (S.D.N.Y.2001); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y.1997). Here, Mr. Hassan concluded that the allocation of the settlement fund to the various job titles covered by the class definition in accord with job classification-specific multipliers was an appropriate and expeditious route to achieving a fair settlement. That conclusion is thoroughly supported in the record and was fully tested at the fairness hearing.

The Court concludes that Alleyne as representative plaintiff and proposed class counsel both fulfill the adequacy of representation requirement in this case, and therefore, that the proposed class in this case clears all four hurdles of Rule 23(a). Accordingly, the Court proceeds to its consideration of the Rule 23(b) requirements.

### 2. *Rule 23(b)*

#### i) *Predominance of Class–Wide Questions*

█ Plaintiff urges the Court to certify the class pursuant to Rule 23(b)(3), which requires two findings: first, that the questions of law or fact common to class members predominate over any questions affecting only individual members, and second, that a class action is superior to other available methods for fairly and efficiently adjudicat-

ing the controversy. The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. To meet the predominance requirement of Rule 23(b)(3), plaintiff must establish that the issues in this case that are subject to generalized proof—and thus applicable to the class as a whole—predominate over those issues that are subject only to individualized proof. *See Amchem*, 521 U.S. at 623, 117 S.Ct. at 2249.

■ Objectors reassert that the predominance requirement is not met, since the applicability of the motor carrier exemption is subject to an individualized evaluation of each class member's job duties. However, defendants have submitted multiple affidavits from employees who state that there were no formal job assignments or practices that determined who did what on any particular moving job, and that on a given job "any man on the crew may be asked to do whatever is necessary to get the job done smoothly", including truck driving and loading. (*See* Dkt. No. 23, Ex. A; Tr. at 71–72). Indeed, such proof also goes a long way in furthering Time Moving's ultimate defense that each individual proposed class member is covered by the motor carrier exemption simply by virtue of their employment as a participant in defendants' moving operations, and, therefore, that they are all uniformly exempt from overtime entitlement. To overcome this defense, each individual member of the class would need to make a showing either that the overall structure of defendants' operations is not how defendants describe it, or that he was not a typical employee of defendants in this respect.

The three objectors are a prime example. While they make a blanket allegation that their duties did not affect the safety of vehicular operations, defendants submit affidavits from several other employees who specifically aver, based on personal knowledge, that each of the objectors performed truck loading duties from time to time. (*See* Dkt. No. 23, Ex. A). Defendants point to Supreme Court precedent providing that truck loaders and drivers are exempt under the motor carrier exemption, and that a partial-duty loader or driver is every bit as overtime-exempt as a full-duty loader or driver. Collectively or individually litigated, it is obvious from the record and the fairness hearing that defendants would raise this identical argument and the same basic proof in response to each and every claim. *See Levinson v. Spector Motor Serv.*, 330 U.S. 649, 673, 67 S.Ct. 931, 91 L.Ed. 1158 (1947).

The Court finds that the issues common to the proposed class predominate over any individualized claims.

ii) *Superiority of Class Action for Fair and Efficient Adjudication*

■ In determining whether a class action is a superior vehicle for fair and efficient adjudication of litigation, subsection (b)(3) directs a court to consider the following nonexclusive factors: the interest of members of the class in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; and the desirability or undesirability of concentrating the litigation of the claims in the particular forum.[5]

■ The class action method appears to be superior in the instant case. The claims of the several hundred putative class members all involve allegations of FLSA and NYLL violations jointly committed by the same two defendants, and there is little likelihood that all of these individuals would otherwise be in a position to seek relief for any alleged overtime violations, given the expense associated with litigating these issues, the relatively small pay-outs expected by each class member, and the lack of access that low-wage workers generally have to legal representation.

In light of all of the foregoing, the Court grants final certification to the class in this action pursuant to Rule 23.

---

5. Rule 23(b)(3)(D) also lists a fourth factor—whether the class action, if tried, would present intractable management problems. However, when a district court is faced with a request for settlement-only class certification, this factor need not be included in the analysis. *See Amchem*, 521 U.S. at 620, 117 S.Ct. at 2248. Such is the case here.

## B. Fairness of Class Settlement

■ Under Rule 23(e), a class action lawsuit cannot be settled without the approval of the district court. In order to protect the interests of the class members, a district court must closely and carefully scrutinize the settlement proposal to make sure that it is fair, adequate and reasonable. *See Plummer v. Chem. Bank*, 668 F.2d 654, 658 (2d Cir.1982). A proffered settlement that is in large part negotiated prior to certification of the class—as is the situation here—is subject to a heightened degree of scrutiny. *See Weinberger v. Kendrick*, 698 F.2d 61, 72 (2d Cir.1982). The Court evaluates a settlement's fairness by examining the negotiating process leading up to the settlement as well as the settlement's terms. In other words, the fairness inquiry requires evaluation from both a procedural and substantive standpoint. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir.2001).

■ In testing procedural fairness, the district court's role is to ensure that the settlement resulted from arm's-length negotiations, and that counsel for the plaintiff class possessed the experience and ability, and engaged in the discovery necessary to effectively represent the class's interests. *See Hertzberg v. Asia Pulp & Paper Co.*, 197 Fed.Appx. 38, 39 (2d Cir.2006). In this Circuit, a substantive fairness inquiry considers the so-called *Grinnell* factors: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a larger judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the risks of litigation. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974).

Objectors oppose the settlement on both procedural and substantive fairness grounds. The Court finds their objections to be unavailing—the settlement is reasonable, fair, adequate, and merits approval.

### 1. *Procedural Fairness*

■ Objectors argue that the relationship between, on the one hand, the timing of the settlement and request for class certification in this case with, on the other hand, events in pending, related actions at least raises a question as to the arms-length nature of the negotiations, and reveals the existence of conflicts of interest between the representative plaintiff and his counsel and the class.

Before addressing the merits of the objection, a brief accounting of those related actions is in order to supply context. Excluding the instant case, there has been one separate action filed in this Court against Time Moving by certain of its employees alleging wrongful deprivation of overtime pay: *McIntosh*. *See supra* at 4. The complaint in *McIntosh* was filed in mid–2007, almost a year prior to the *Alleyne* complaint. *McIntosh* was not a class action. There were four plaintiffs—Stanley McIntosh, Rahamut Shah, Claude Eastman and Felix Lewis—who were also represented by class counsel in this case. In January 2008, McIntosh settled with defendants and released all claims against them.[6] The settlement amount totaled $12,313.46, of which $7063.46 was payable to McIntosh, and the $5250 balance payable to counsel. The remaining three plaintiffs, Shah, Eastman and Lewis—who had been employed by defendants as, respectively, a warehouse manager, a warehouse supervisor and a carpenter, and thus would have been included in the class here had they not opted out—proceeded with the *McIntosh* action and the parties engaged in a lengthy discovery process including document production and several depositions. In June 2008, these *McIntosh* plaintiffs reached a settlement with defendants in that action, and after preliminary class certification in

---

**6.** At the fairness hearing in the instant case, Mr. Hassan explained that plaintiff McIntosh had worked for Time Moving as an electrician and suffered from a medical condition that made it very unlikely that he had participated in any loading of moving trucks—therefore, he had a relatively strong argument that the motor carrier exemption did not apply to him.

the instant case, those plaintiffs formally opted out of the class. The discovery and pre-trial in *McIntosh* had been handled jointly with that in *Alleyne* under the supervision of Chief Magistrate Judge Steven M. Gold (*see* Tr. at 9, 36), and the fruit of the *McIntosh* formal discovery was available for *Alleyne* without needless replication.

In the Southern District, two cases have been filed against defendants by workers alleging wrongful deprivation of overtime pay: *Ortiz v. Time Moving & Storage, Inc.*, No. 08–cv–5003, pending before Judge Deborah Batts, and *Perez*, before Judge McMahon. *See supra* at 6.

*Ortiz*, like *McIntosh*, not a class action lawsuit, initially had three plaintiffs: Marco Ortiz, Marco Nanez and Manuel Escobar. The latter two withdrew their claims, electing to participate in this action. Ortiz—who, like McIntosh, claimed that he was an electrician and not a mover—has elected to proceed with his own case individually and opted out of the instant action.

*Perez* was brought as a class action on behalf of a class defined in the amended complaint as: "all persons employed by defendants as supervisors or helpers, who did not load trucks, who were not paid the statutory overtime premium for hours worked in excess of forty hours in a workweek, or who were not paid for all hours worked in a day, at any time between March 17, 2002 and the date of final judgment in this matter." [7] (Dkt. No. 18, Ex. 1). There were five representative plaintiffs: Edwin Perez, Darren Gold, Johnny Spruill, Nelson Escobar and Javier Yangua, all represented by their proposed class counsel, Mr. Stein. After a settlement was reached in the instant class action, Escobar and Yangua both chose to opt out, and are still pursuing their claims through the Perez action. However, *Perez*, Gold and Spruill withdrew from *Perez* and, in their capacity as members of the class in this case, promptly filed objections to class certification and settlement through Mr. Stein.

In the summer of 2009, Judge McMahon directed the *Perez* plaintiffs to file a class certification motion. Shortly thereafter, counsel in this case notified the Court that they had reached a settlement agreement. Objectors argue that the concurrence of the start of the class certification process in *Perez* and the achievement of a settlement here suggests that the settlement negotiations were not "arms-length." In response to Mr. Stein's suspicion, Mr. Hassan avers that the parties in fact had already finished settlement negotiations and had reached a settlement in principle before a class certification briefing schedule was finalized in *Perez*. Even more to the point, Mr. Hassan avers that the settlement of this case was in fact precipitated by the conclusion of discovery in *McIntosh*, and that contemporaneous developments in *Perez* were irrelevant. (Dkt. No. 18 at ¶¶ 29–44).

Further, according to Mr. Hassan's representations to the Court, in conjunction with the formal discovery he took in *McIntosh*, he developed a solid understanding of operations at Time Moving and the duties performed by their individual workers. Additionally, he states that he gathered significant information by informally speaking with dozens of current and former employees of defendants, and by intensively researching defendants' arguments regarding the across-the-board applicability of the motor carrier exemption. (Dkt. No. 18 at ¶¶ 38–44). Based on this knowledge of Time Moving's operations and his past experience, Mr. Hassan claims that, with a handful of exceptions, he would not take on the cases of Time Moving employees on an individual basis because their claims were in all likelihood precluded by the exemption. (Tr. at 14). He believed, he urges, that a class settlement would yield the best possible results for most employees, as it would

---

7. The initial complaint filed in *Perez* defined the potential class as: "all persons who were employed by defendants at any time since March 12, 2002, to the entry of judgment in this case ..., who were non-exempt employees within the meaning of the New York Labor Law, and who have not been paid overtime wages in violation of the New York Labor Law." Judge McMahon dismissed the complaint with leave to replead, holding that the plaintiffs' job duties were not described with sufficient specificity. *See Perez v. Time Moving & Storage, Inc.*, No. 08–cv–2775, 2008 WL 5662070, at *2 (S.D.N.Y. Jan.15, 2008).

guarantee them at least some recovery on claims that would very likely amount to nothing if litigated. (Dkt. No. 18 at ¶¶ 56–57).

Nor is that conclusion changed by the natural extension and application to a procedural fairness consideration of the argument advanced by objectors in opposition to a finding of "commonality and typicality" and in support of the formation of subclasses: the alleged conflict of the "driver" job classification with "mover" and other job classifications. Objectors contend that this conflict is fatal to the settlement negotiations and the ultimate agreement.

Sharpening the focus of their attack, objectors bludgeon the proposed settlement on their assumption that class counsel engaged in a "rob Peter to pay Paul" strategy—arriving at a global settlement figure and then sharing it among the various job classifications, such that Peter—the "movers"—is robbed to pay Paul—the "drivers", whom objectors contend are entitled to nothing. (*See* Tr. at 51, 64–66; Objection, Dkt. No. 15 at 17). Indeed, if there was *any* proof that such was the case, not only could the settlement be seriously questioned but the conflict between subsets of employees would suggest the need for the creation of subclasses. But, not only is there no such proof, there is compelling testimony to the contrary. As articulated in open court both by Mr. Hassan and Mr. Robb, objectors' suspicion is not the way *they* actually negotiated the settlement. What was negotiated was the liability assessment, *i.e.*, claim vulnerability to the motor carrier exemption, on an individualized job classification by job classification basis, to which actual wage and hour data for each covered employee was applied. (*See* Tr. at 50–55, 71–72). Thus, the record supports neither an attack on the settlement process nor the need to create formal subclasses. *See supra* at 13.

The Court finds, consequently, that objectors' suggestion of impropriety is simply unfounded. No facts, other than the coincidence of timing, are offered by objectors to contradict the factual, flat-out denial of their suspicions by Mr. Hassan and Mr. Robb. The Court finds as a matter of fact that the settlement in this action resulted from arms'-length negotiations and that class counsel possesses the requisite experience and ability and, by engaging in discovery and investigation, has gathered the facts necessary to permit effective representation of the class members' interests.

### 2. *Substantive Fairness*

 After considering all of the record evidence adduced through and including the fairness hearing as well as the arguments advanced for and against the settlement agreement in light of the *Grinnell* factors, the Court finds that, substantively, the settlement should be approved.

#### i) *Complexity, expense, and likely duration of litigation*

If the settlement is rejected, the litigation of class claims would be extremely complicated, costly and protracted, particularly because all of the claims require determination of the applicability of the motor carrier exemption, which all parties acknowledge mandates an individualized and highly fact-intensive analysis.

#### ii) *Class reaction to settlement*

Class reaction to settlement has been favorable. Less than 1% of the class has objected, and only seven of the several hundred class members has opted out. Further, six of the seven opt-outs were already pursuing their claims in separate actions when the settlement in this case was reached.

#### iii) *Stage of proceedings and amount of discovery completed*

Although the settlement was reached early in the pendency of this case (pre-formal document disclosure), extensive discovery of Time Moving relevant to the parties and issues here had previously been undertaken by class counsel as plaintiffs' counsel in the *McIntosh* case. In that action, plaintiffs brought claims similar to the *Alleyne* claims, and the plaintiffs and defendants there were deposed and the parties engaged in document discovery. The Hassan affidavit also outlined his interviews of numerous former

and current employees of defendants and his process of gathering information directly relevant to the size of the class in this case as well as the amount of potential damages. As a result, the Court concludes that the facts were sufficiently developed to enable counsel to assess accurately the merits of the settlement agreement in this action.

### iv) *Risks of establishing liability*

The risks of establishing the liability of Time Moving to class members appear to be most daunting. This factor weighs strongly in favor of settlement. Although the merits of the motor carrier exemption defense as raised by Time Moving has never been tested through a final litigation battle, the Court sees no reason to doubt and plenty of reasons to concur with Mr. Hassan's informed opinion that the provision would operate as a powerful bar to recovery of overtime compensation by any typical member of the class. Objectors apparently also concur, as they strenuously argue that many of the members of the class in this action (excluding objectors themselves, of course) are categorically barred from recovering any overtime compensation under the FLSA and/or NYLL.

While it is not inconceivable that some class members could respond to the defendants' reliance on the exemption by pointing to discrete facts of their duties or physical limitations that set them apart from other employees performing in the same job classification—for example, the existence of an injury which made it physically impossible to participate in truck loading—that is clearly not the norm. Significantly on this score, all of the class members were given the opportunity to opt out of the settlement if they believed themselves to be entitled to a higher recovery, and only a handful chose to avail themselves of that opportunity. Given the nature of this case, this *Grinnell* factor has enormous significance, and weighs overwhelmingly in favor of the proposed settlement.

### v) *Risks of establishing damages*

This consideration carries little weight in evaluating the settlement agreement. Plaintiff concedes that damages for unpaid overtime are easy to establish since they are based on data in defendants' possession, including records of hours worked by and wages paid to individual employees.

### vi) *Risks of maintaining class action through trial*

This factor weighs in favor of settlement. In keeping with the information gathered from class counsel's investigation and from discovery in *McIntosh,* there is a clear and substantial risk that most class members would obtain zero recovery if their claims were individually litigated and, correspondingly, would require much effort for virtually no collective gain. Indeed, class counsel has conceded that he would not seek certification without this settlement. (Dkt. No. 18 at ¶ 61). Litigation of the defined class as a class through trial is not likely.

### vii) *Defendants' ability to withstand larger judgment*

There is some support for the conclusion that Time Moving cannot likely withstand a larger judgment than the settlement amount. Time Moving, whose clients primarily involve law firms and financial institutions, has seen dwindling business in recent recessionary times and its liquidity has been limited as a result. In fact, the record shows that because of claimed financial difficulties, Time Moving insisted on expensing the agreement payments into the settlement fund on an installment plan, rather than a lump sum deposit of $180,000. (Dkt. No. 18 at ¶ 84; Dkt. No 9 at ¶ 3. 1). Ultimately, however, the arguments advanced relevant to this *Grinnell* factor are based on conclusory assertions—the record contains no hard proof that Time Moving cannot afford, from a strictly financial standpoint, to pay more to settle the class claims. This factor offers little or no support for the settlement.

### viii) *Range of reasonableness of settlement fund in light of best possible recovery*

As the record establishes, the settlement fund represents approximately 17% of the maximum potential recovery of gross unpaid overtime for the class over the six-year statute of limitations period, which totals

$1,074,000. Objectors point out that this maximum recovery estimate does not factor in liquidated damages, which are not available in a Rule 23 class action, and are only recoverable in an FLSA collective action— which class counsel will not pursue if the settlement is approved. In turn, class counsel acknowledges that, considering all available relief that might be obtained if plaintiff was totally successful at trial, including potential liquidated damages as well as additional recovery for employees who arrived at and began work before the official start of their shifts, the $180,000 settlement is still 13% of that best possible recovery. As a benchmark, in *Grinnell,* the Second Circuit found that a 12% recovery was reasonable. *See* 495 F.2d at 461–62. One to five percentage points higher than *Grinnell,* the settlement fund is in the range of reasonableness when compared to the maximum possible recovery.

### ix) *Range of reasonableness of settlement fund in light of risks* of litigation

Finally, on this extremely important factor, the Court finds that the class recovery under the settlement agreement is reasonable in light of the super-substantial risks of litigation. Indeed, given the high probability that litigation would yield no recovery whatsoever for most, if not all, of the class members due to the applicability of the motor carrier exemption, even a lower settlement amount would be within the range of reasonableness here. Further, the negotiation of the settlement, including the allocation of the settlement fund by job classification was carried out by experienced and informed class counsel, who has shown on the record and at the fairness hearing that the settlement structure is a fair and adequate method to compensate class members with varying principal job tasks with varying degrees of vulnerability to nonsuit as a result of the motor carrier exemption. (*See* Tr. at 51–55, 71–72).

Taken as a whole and balancing all of the *Grinnell* factors, the Court concludes that the settlement agreement proposed by class counsel is certainly fair, more than adequate and is clearly reasonable considering the unlikelihood of success otherwise. It merits, and thereby is awarded, the approval of the Court.

### C. ATTORNEY'S FEES

■ In reviewing a class action settlement agreement for final approval, Rule 23(h) requires that a district court assess and approve the reasonableness of attorney's fees for class counsel. To determine what qualifies as a reasonable attorney's fee in the class action context, a district court may use either of two distinct methods. The first is the lodestar-type methodology, under which the court reviews a fee application submitted by counsel to ascertain the number of hours reasonably billed to the class, and then multiplies that figure by an appropriate hourly rate.[8] Under the second and simpler approach, the court approves an award of a percentage of the class settlement fund to compensate counsel, with reference to the lodestar or presumptively reasonable fee calculation as a cross-check. Regardless of whether the lodestar or percentage method is chosen, the Court's assessment of the reasonableness of the fee is guided by the same criteria: the time and labor expended by counsel; the magnitude and complexities of the litigation; the risk borne in the litigation; the quality of the representation; the requested fee in relation to the settlement; and public policy considerations. *See Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 50 (2d Cir.2000).

■ In this case, class counsel and counsel for defendants negotiated and agreed upon the fee provision in the settlement agreement, pursuant to which class counsel would receive one third of the total settlement fund, or $60,000; objectors oppose,

---

8. Although this Court refers to the term "lodestar", it is cognizant that in *Arbor Hill Concerned Citizens Neighborhood Assoc. v. County of Albany,* 522 F.3d 182 (2d Cir.2008), the Court of Appeals recast its formulation of the "lodestar" fee as the "presumptively reasonable fee", which should be calculated using the district court's determina-

tion of a "reasonable hourly rate." *See id.* at 190; *Konits v. Valley Stream Cent. High Sch. Dist.,* No. 08–cv–4351, 2009 WL 3424830 (2d Cir. Oct.26, 2009). *Arbor Hill* clarified that "the reasonable hourly rate is the rate a paying client would be willing to pay" in the district where the case was litigated. 522 F.3d at 190.

claiming that the fee award is excessive. Though acknowledging that a one-third recovery by a class counsel would ordinarily be reasonable, objectors argue it is unreasonable here on two grounds. First, they postulate that if the fee is measured as a percentage of the settlement claimed or collected by the class members, the fee is more than one-third because not every member of the class received actual notice (in deliverable mail) and because it is highly likely that some members who did receive notice will not cash their checks. Second, they argue that a lodestar calculation would result in a fee award of less than $60,000. Their arguments do not carry the day. The Court finds the fee award contemplated by the settlement agreement to be reasonable.

As to objectors' point that the fee percentage should be calculated with respect to the portion of the settlement fund actually claimed by class members, the argument is forestalled by the Second Circuit's recent decision in *Masters v. Wilhelmina Model Agency, Inc.* 473 F.3d 423, 437 (2d. Cir. 2007). In that case, the Circuit held that, when using the percentage method, the proper number against which attorney's fees are measured is the amount of the entire fund created by the efforts of counsel, not the amount actually claimed or collected by the class. Objectors seek to distinguish *Wilhelmina* on the grounds that, in that case, the unclaimed amount of the settlement fund did not revert to the defendants, but was to be distributed as the district court in its discretion decided was best. The district court had chosen to distribute the excess funds under the *cy pres* doctrine to several charities that would directly or indirectly benefit members of the class. That fact, however, is irrelevant to the basic holding regarding the assessment of the value of the legal services rendered, which applies with equal force here. In choosing the proper baseline for calcula-

tion of fee percentage, our Circuit case law directs courts to focus on fairly compensating counsel for work actually performed, given that "the entire fund, and not some portion [of it], is created through the efforts of counsel at the instigation of the entire class. An allocation of fees by percentage should therefore be awarded on the basis of the total funds made available, whether claimed or not." 473 F.3d at 437. The value of legal advice rendered but not heeded is undiminished by its rejection. Nor is the value of legal service rendered in the creation of a settlement fund diminished by the failure of beneficiaries to cash in, regardless of what happens to the surplus.

Nor does objectors' second argument—that the fee amount exceeds a lodestar computed fee—withstand scrutiny. First off, class counsel does not seek his fee on a lodestar basis. More importantly, however, given the level of skill and experience demonstrated by Mr. Hassan, for cross-check purposes, there is enough on a broad lodestar approach to sustain the percentage fee he seeks. Consistent with the fees recognized as reasonable for attorneys of his caliber practicing in the Eastern District[9], Mr. Hassan's legal work is billable at an hourly rate of $300, which, it is true, is below the $450 an hour rate he suggested in defense of his fee. Objectors jump on this claim and correctly characterize a $450 hourly fee as unreasonably high. They go on to argue that plaintiff's counsel had hardly any work to do in this case in light of the fact that settlement was reached so soon after the complaint was filed, and that the settlement administration work that is claimed to have been performed could have been assigned to a less expensive paralegal.

More significantly, because plaintiff's counsel had operated on his anticipation of seeking a percentage fee should the action prove

**9.** In evaluating class counsel fees in the context of another wage-and-labor case, this Court noted that "hourly rates for attorneys approved in recent Eastern District of New York cases have ranged from $200 to $350 for partners, $200 to $250 for senior associates, $100 to $150 for junior associates, and $70 to $80 for legal assistants." *Cho v. Koam Med. Services P.C.*, 524 F.Supp.2d 202, 209 (E.D.N.Y.2007) (collecting cases and awarding fees in a FLSA and NYLL case based on a $250 hourly rate for a partner). In an even more recent case from within this district, a court approved an hourly rate of $250 for the services of an experienced attorney who had practiced exclusively in the area of labor and employment law for more than a decade. *See Estrella v. P.R. Painting Corp.*, 596 F.Supp.2d 723, 724–26 (E.D.N.Y.2009).

successful in some way, Mr. Hassan declares that he did not keep time records in sufficient detail to support a lodestar or presumptively reasonable fee calculation. Although the Court does not approve of counsel's poor decision not to keep detailed records, it is also mindful that counsel does not seek to justify his fee by way of a lodestar-style methodology, where his inability to justify his fees for failure to keep such records would have seriously undermined his fee request. Moreover, while the Court is deprived of its ability to fully "cross-check" the reasonableness of the percentage fee counsel seeks, using a $300 an hour rate, and given the amount of time that counsel expended on investigation, case management, negotiation and defense of the settlement and will expend on upcoming settlement fund administration that counsel has described, an all-encompassing $60,000 fee would certainly be within the range of reason.

Accordingly, after considering these relevant factors, the Court finds that attorney's fees of one third of the settlement fund, totaling $60,000, are reasonable. As noted above, class counsel is experienced in wage litigation, with subspecialization in motor carrier exemption work, and has provided the class with high-quality representation. What is more, as objectors themselves have pointed out, the case is hardly a slam-dunk—like the class members themselves, class counsel ran a very real risk of recovering nil. Public policy favors generous attorney's fees in a case such as this, because the small size and questionable merits of the individual class members' claims necessitated prosecution of the action on a class or representative basis. If counsel did not have the prospect of an award that took account of the substantial risks and uncertainties of such litigation, there would be no incentive to take this type of case at all and the vast majority of the class would have gone without prospect of recovery. The fee request of class counsel is approved.

## D. MOTION TO INTERVENE

 On a concluding note, objectors argue that they should be allowed to intervene, either as of right, pursuant to Rule 24(a), or permissively, pursuant to Rule 24(b), and to conduct discovery, on the grounds that their interests are not being adequately represented by class counsel. For the reasons set forth previously, the Court finds that class counsel has adequately represented the interests of all class members in negotiating the settlement agreement, and, therefore, objectors cannot intervene as of right. Further, the Court sees no reason to exercise its discretion to permit objectors to formally intervene at this juncture. In a class action, the goal of permitting intervention is to enable class members to function as effective watchdogs, ensuring that the action is fairly and adequately conducted. Objectors were already given a full opportunity to air their quarrels with counsel and the settlement through the fairness hearing, and those concerns have been addressed in the course of the Court's consideration of the objections. Thus, intervention is unnecessary, unwarranted, and would simply cause needless delay and add to litigation costs.

The Court notes that objectors were initially plaintiffs in a separate action in the Southern District in which they sought recovery from defendants on the very same claims, and that objectors withdrew from that case in order to join this action. In signing on, objectors were fully aware of precisely what recovery they would be entitled to if this settlement agreement was approved, given the fact that class certification and settlement approval were sought simultaneously. Indeed, the notice sent to each individual class member clearly stated the exact dollar figure that each would be entitled to under the settlement agreement. To the extent that objectors believed that the settlement gave short shrift to the merits of their claims and undervalued their potentially recoverable damages, the logical course was to opt out and continue to pursue their claims in the Southern District case—in fact, two of objectors' co-plaintiffs in that action, represented by the same counsel, did just that. Obviously, the eyes-wide-open decision of objectors to be bound by this settlement agreement and then promptly attack it with allegations of unfairness and inadequate representation was a strategic move to preserve the possibility that objectors would be the class representatives in an action of their own elsewhere or of a subclass here, all of

which they were entitled to pursue. Their monkey-wrench strategy cannot succeed, however, without some factual showing; a showing that would have led the Court to a different conclusion when applying the *Grinnell* test. There was no such showing and the same record evidence (and absence of evidence) that led the Court to grant class certification, to reject the formation of subclasses, and applaud the settlement agreement compels denial of the motion by objectors to intervene.

## CONCLUSION

In line with the foregoing, the Court grants final class certification and final approval of the class settlement agreement, including the provision of the agreement pertaining to the compensation of class counsel and its award of $60,000 in attorney's fees. Further, the Court denies objectors' motion to intervene and thereby conduct additional discovery. The Court also orders the monies allotted by the settlement agreement to Mr. Earl Legrande, deceased, to be paid to his widow, Sharon Legrande, and the monies allotted by the settlement agreement to Mr. Neil Magliano, deceased, to be paid to his widow, Joan Magliano.

Pursuant to ¶ 10.1 of the Settlement Agreement, class counsel and counsel for defendants are directed to submit a proposed final order and judgment.

SO ORDERED.